# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN CONSOLIDATED INDUSTRIES, INC., *et al.*, | ) ) ) | Case No. 1:19-cv-137 |
| Plaintiffs, | ) ) | Judge J. Philip Calabrese |
| v. | ) ) | Magistrate Judge Thomas M. Parker |
| CHAD BLASINGIM, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| MONARCH STEEL COMPANY, INC., | ) ) | Case No. 5:17-cv-2253 |
| Plaintiff, | ) ) | Judge J. Philip Calabrese |
| v. | ) ) ) | |
| JAMES MCCRACKEN, *et al.*, | ) ) | |
| Defendants. | ) ) ) ) | |

## REPORT AND RECOMMENDATION OF SPECIAL MASTER

This Report and Recommendation is submitted pursuant to the Court's October 6, 2021 Order Appointing Special Master [ECF No. 122][1] (the "Appointment Order"). For the reasons set forth in detail below, I respectfully recommend that the Court (1) find Liberty Steel Products, Inc. ("Liberty") in contempt in the captioned *McCracken* matter (Case No. 17-cv-2253); (2) find that Liberty engaged in sanctionable discovery conduct in the *Blasingim* matter (Case No. 19-cv-137); and (3) as a "curative" sanction, require that Liberty exclusively bear all fees and expenses associated with these Special Master proceedings, including the Special Master compensation and

---

[1] For ease of reading, unless otherwise indicated, all ECF references are to the docket in *Blasingim*, Case No. 1:19-cv-137.

third-party vendor fees. Liberty also should be required at its sole cost to work with a third-party forensic vendor to securely delete from all of its systems any remaining information that constitutes Monarch's Protected Property and Information.

In addition, in light of Defendant Blasingim's production on May 9 and 11, 2022 of what apparently amounts to 10,000 new documents, I respectfully recommend that the Court reopen discovery in the *Blasingim* matter for the very limited purpose of allowing Plaintiffs sufficient opportunity to follow up on the information that has come to light through these Special Master proceedings and Blasingim's recent production, and to seek related sanctions against Blasingim as may be warranted, as contemplated by the Court's April 5, 2022 Order [ECF No. 145].

## I.     RELEVANT FACTUAL DISCUSSION

### A.     The Parties.

According to its website, Liberty is in the business of processing "coated, cold rolled, and hot rolled steel and provides a variety of state-of-the-art stamping and blanking services." It is headquartered in North Jackson, Ohio. Monarch Steel Company, Inc. ("Monarch") is a subsidiary of American Consolidated Industries ("ACI"). According to its website, Monarch "is one of the country's largest providers of hot rolled, cold rolled and galvanized steel product." It also is headquartered in Northeast Ohio, but has Service Centers in Alabama, Kentucky, and Ohio. Liberty and Monarch are competitors.

Beginning in 2017, Liberty sought to establish a presence in the southeastern United States through the acquisition of Mississippi Steel Processing, LLC ("MS Steel"), and to expand its sales force in that region. James McCracken, Jon Campbell, and Chad Blasingim were employees of Monarch who were recruited to join Liberty as part of this "Southern Strategy."[2] *See* Lib. Subm.

---

[2] Following extensive discovery, I requested the parties provide written submissions outlining their respective positions on the questions the Court presented to me. On April 8, 2022, Plaintiffs served their

(Sanctions) at 3-4. McCracken ended his employment with Monarch on or about September 11, 2017; Campbell was terminated from his employment on February 6, 2018; and Blasingim resigned from his role as an outside consultant with Monarch on August 17, 2018. After their departures from Monarch, each man was employed by Liberty for brief periods of time. The captioned matters arise from those employment relationships, and Monarch's claims that each of its former employees improperly took and/or used Monarch trade secret information for the benefit of Liberty and for the purpose of competing with Monarch in violation of state and federal laws.

### B. *McCracken* Litigation

#### 1. Monarch Files Suit Against McCracken and Liberty

On October 24, 2017, Monarch filed a complaint against McCracken, JIMMYMAC, LLC (his company), and Liberty (Case No. 17-cv-2253). Monarch alleged that, before McCracken left Monarch, he emailed himself confidential and proprietary trade secret information from Monarch's computer system, including "volume and pricing structure details pertaining to significant customer and vendor agreements." *See McCracken* Compl. ¶¶ 14, 41 [*McCracken* ECF 1]. Monarch sought damages for misappropriation and tortious interference along with injunctive relief.

#### 2. Settlement and Dismissal

The parties globally settled the lawsuit just over one month later on November 27, 2018. Of relevance here, the parties' Settlement Agreement required as follows:

---

Submission to the Special Master on Motion for Contempt and Request for Discovery Sanctions ("Pl. Subm."). On April 29, 2022, Liberty served its submission in two parts: (1) Defendant Liberty Steel Products, Inc. Position Statement to the Special Master on Plaintiffs' Motion for Contempt ("Lib. Subm. (Contempt)") and (2) Defendant Liberty Steel Products Inc.'s Position Statement in *Blasingim* ("Lib. Subm. (Sanctions)"). By agreement, the submissions will be filed as appendices to this Report and Recommendation so as to be made part of the record. Where possible, to avoid increasing the volume of filings, I cite to the parties' submissions and their exhibits.

3.    Agreement Not to Use Monarch's Property and Information. McCracken, JIMMYMAC, and Liberty are prohibited from using, copying, retaining, or disclosing Monarch's trade secret property and protected information as defined by federal and Ohio law. Notwithstanding trade secret or protected information status, McCracken JIMMYMAC, and Liberty are also prohibited from using, copying, retaining or disclosing any Monarch documents or information obtained from Monarch's databases, systems, or records whether in electronic or paper form that Monarch/JimmyMac LLC has secured from his prior employment with Monarch. (All of this information to be defined as "Monarch's Protected Property and Information").

4.    Return of Monarch's Protected Property and Information. McCracken, JIMMYMAC, and Liberty agree to return to Monarch and then destroy all Monarch Protected Property and Information that is in their possession or under their control under the process and protocol identified below. . . .

    **a.    Liberty's Obligations To Return Monarch Protected Property and Information**

        1.    Within ten (10) days of the effective date of this Settlement Agreement, Liberty, at Liberty's cost, shall allow a forensic examination and inventory by a forensic expert . . . of a certain cell phone, and laptop which Liberty provided to McCracken/JIMMYMAC. The expert shall provide all counsel with an inventory of all items and information that are included on such devices. . . . Within five (5) business days of Monarch receiving an inventory, Monarch will confirm the identity of all Monarch protected property and information on the inventory and its position on assertions of privilege. . . . If there is no disagreement with the items so identified by Monarch in the inventory as its property, after five (5) business days of the parties' receipt of the inventory, all such Monarch Protected Property and Information will be returned to Monarch and purged by the forensic expert from the device(s) or account in question. Any hardcopy of Monarch Protected Property and Information shall be provided to Monarch. . . .

        2.    Within five (5) days of the effective date of this Settlement Agreement, Liberty agrees to return to Monarch all emails and communications between it and McCracken/JIMMYMAC stored on devices and in accounts other than those described in paragraph 4(a)(l), subject to the redaction of any confidential, proprietary or privileged information of Liberty/McCracken/JIMMYMAC. Liberty/McCracken/ JIMMYMAC shall provide a privilege log identifying withheld or redacted information. If any information contained in these emails or communications contain Monarch's Protected Property and Information,

4

Liberty/McCracken/JIMMYMAC agrees, except as otherwise provided herein, to destroy and purge all copies of the information whether in electronic or paper form. . . .

3.      Liberty agrees to verify via the attached affidavit (Exhibit 1) that all locations and devices within their possession and control have been searched and all Monarch Protected Property and Information has been returned and none has been copied, retained, used, or disclosed to anyone else except as otherwise provided herein.

* * *

6.      Restriction on the Activities of Liberty, McCracken and JIMMYMAC. Liberty, McCracken and JIMMYMAC to confirm via the attached affidavits (Exhibits l and 2) that no formal purchase orders have been made based upon the efforts of McCracken or JimmyMac LLC with Liberty or by them on behalf of any other competitor of Monarch apart from [an order with a specified customer].

*McCracken* Settlement Agmt. (Pl. Subm. Ex. 1).

On December 12, 2017, Judge Lioi entered a Stipulated Dismissal with Prejudice [*McCracken* ECF No. 21] (the "Dismissal Entry"). The Dismissal Entry expressly directed that "Defendants are prohibited from using, copying, retaining, or disclosing Monarch's 'protected property and information' as defined in the parties' Settlement Agreement." The Court also expressly retained jurisdiction over the Settlement Agreement.

### 3.      Settlement Implementation

When the parties executed the Settlement Agreement on November 11, 2017, Liberty's then-President and CEO, James Grasso, also executed an affidavit attesting that:

Liberty has searched all systems, accounts, and devices belonging to Liberty for any information belonging to Monarch Steel Company, Inc. . . . After return of Monarch's Protected Property and Information as defined in the parties' Settlement Agreement, Liberty further instructed a third party forensic expert to delete all Monarch Protected Property and Information (and copies).

Grasso Aff. (Pl. Subm. Ex. 2).

Despite Grasso's contemporaneous attestations that at least some of the required document

remediation had been completed, the Settlement Agreement was largely executory, and the parties spent nearly a year and a half implementing its terms. Lib. Subm. (Contempt) at 6. Among other things, Liberty's CFO, Jason Mericle, executed an affidavit on May 23, 2018 "for purposes of implementing" the Settlement Agreement. In his affidavit, Mericle confirmed that "all e-mails to or from James E. McCracken have been securely deleted" by way of deleting McCracken's "entire e-mail account with Liberty," "there are no paper or electronic copies or images of the items deleted," and "Liberty has not used or disclosed any of the items or information which were the property of Monarch," and "Liberty has no such information from other sources." Mericle 2018 Aff. (Pl. Subm. Ex. 3).

Affidavits and documents produced by Liberty during the Special Master proceedings confirm Mericle's 2018 statements that Liberty deleted McCracken's Liberty email account in effectuating the Settlement Agreement. Mericle 2022 Aff. (Pl. Subm. Ex. 5); *see also* MCCRACKEN039953 (attached as Ex. AA). However, the same affidavits demonstrate that Grasso's 2017 affidavit was not accurate, in that Liberty did not engage a third-party forensic expert to delete Monarch's protected property and information from its systems. The only third-party forensic expert engaged to carry out the terms of the Settlement Agreement was Brett Kimmell, a security consultant who was retained exclusively to "examine certain devices [belonging to McCracken] . . . and to review a certain email account for the purposes of identifying and gathering emails that may have contained Monarch's protected property and information." Kimmell Aff. (Pl. Subm. Ex. 4); Mericle 2022 Aff. (Pl. Subm. Ex. 5).

For its part, Liberty chose to handle remediation of its systems "in house." According to Mericle, Liberty believed "that the primary means by which James McCracken likely could or would have transmitted any information . . . would have been through e-mail." Mericle 2022 Aff.

(Pl. Subm. Ex. 5). Accordingly, "Liberty did not view a forensic search of its servers to be a necessary or appropriate expense." *Id.* Instead, Liberty's leadership team managed the remediation, primarily by instructing (a) Liberty's Director of Strategic Projects and sole IT employee to perform a search and verify that all "emails to or from McCracken" were deleted; and (b) Liberty's Vice President of Service Center Sales to "look for any files and documents containing Monarch Protected Property and Information and delete them." *Id.*; Ranelli Aff. (Pl. Subm. Ex. 6); *but see* MCCRACKEN039953 (Ex. AA) (email from IT employee to Grasso that she had carried out his request that "all email sent or received from Jim McCracken should be fully deleted off the accounts of certain users.").

Liberty admits that its in-house approach was unsuccessful in remediating all Monarch Protected Property and Information from Liberty's systems, a fact that came to light during discovery in the *Blasingim* litigation. On May 5, 2021, Mericle testified on behalf of Liberty that he had recently "found out that there was some items that had been missed" when Liberty had its "IT people search and delete anything associated with Jim McCracken." Mericle Depo. Tr. 48:12-50:6 (attached as Ex. BB); *see also* Mericle 2022 Aff. (Pl. Subm. Ex. 7). Mericle subsequently explained by affidavit that he had instructed Liberty's outside IT vendor to conduct a search of Liberty's systems, after learning in deposition preparation that Monarch was "claiming that Liberty's document production in *Blasingim* contained documents that it alleged violated the" *McCracken* Settlement Agreement. Mericle 2022 Aff. (Pl. Subm. Ex. 7).

Liberty's Submission on Contempt acknowledges that at least six documents identified through the searches conducted at Mericle's direction and in these Special Master proceedings are "potentially violative" and were "overlooked" in Liberty's remediation process. These documents are:

| MCCRACKEN005988-90 | June 29, 2017 email from McCracken (using his monarchsteel.com email account) to Grasso directly forwarding "coil quote" information from ███████.; Grasso in turn forwarded the information to another Liberty employee, asking "do we have inventory?" |
| MCCRACKEN043270 | August 24, 2017 text message from McCracken to Grasso, communicating what appears to be Monarch customer bid information. |
| MCCRACKEN043269 | August 24, 2017 text message from McCracken to Grasso, communicating information about a Monarch customer bidding process and stating "I have ███████ working on getting Steve the bid package." |
| MCCRACKEN005818-21 LIB055512-13 | August 25, 2017 email from McCracken (using his monarchsteel.com email account) to Grasso regarding "bullet points we [Monarch] agreed to on the ██████████████ ███████;" Grasso in turn forwarded the information internally. |
| MCCRACKEN043282 | August 31, 2017 text message from McCracken to Grasso, communicating what appears to be Monarch's customer bid information. |

Plaintiffs assert that approximately seven additional documents also were improperly retained by Liberty. *See* Pl. Subm. at App. B (documents in yellow).

## C.    Blasingim and Campbell Leave Monarch for Liberty

In the meantime, while the parties were implementing the *McCracken* Settlement Agreement, and before Mericle executed his affidavit that Liberty had not used or disclosed Monarch Protected Property and Information and did not have any such information from other sources, Liberty hired Campbell (February 2018)[3] and began communicating with Blasingim about possible employment (March 2018). *See* Pl. Subm. at 4. Documents produced during these Special Master proceedings show that, while they were being recruited to join Liberty, both Blasingim and Campbell emailed and texted information about Monarch's business and from Monarch's systems

---

[3] From February until approximately August 2018, Monarch was unaware of Campbell's employment with Liberty. Pl. Subm. at 4, n.2. In fact, Campbell used an MS Steel email account during that time, which he characterized in communications with Grasso as "camouflage." Pl. Subm. at 4.

to themselves, each other, and to Liberty. For example, on February 7, 2018, the day after Campbell was terminated from Monarch, Blasingim texted him a picture of an email on his Monarch computer showing "CRU Index Numbers."[4] *See* Pl. Subm. at 5 (citing MCCRACKEN033743).

### D.  *Blasingim* Litigation

#### 1.  Monarch Files Suit Against Blasingim, Campbell, and Liberty

On January 17, 2019, Monarch along with ACI filed separate complaints against Blasingim (19-cv-00137) and Campbell (19-cv-00138). In March 2019, Blasingim and Campbell answered the complaints against them through their common counsel at Dentons Cohen & Grigsby ("Dentons"). On May 13, 2019, Plaintiffs filed amended complaints to add Liberty as a defendant in both actions. Generally, Plaintiffs allege that all defendants misappropriated confidential, proprietary, and trade secret information in violation of state and federal law, tortiously interfered with Monarch's customer relationships, converted Monarch's property, were unjustly enriched, and engaged in a conspiracy to steal Monarch's business. *See* First Am. Compl. [ECF No. 26].

The cases were formally consolidated under the *Blasingim* case number on or about June 3, 2019. All three defendants answered the amended complaint through new counsel at Gallagher Sharp LLP, with attorneys Julie Juergens, Steven Strang, and Rema Ina appearing on the signature block [ECF Nos. 35-37]. Dentons contemporaneously sought and was granted leave to withdraw

---

[4] This appears to be a third-party index related to steel performance in the stock market. I make no finding as to the significance of this document to the underlying dispute (*i.e.*, whether it is trade secret information). It and similar documents produced during these proceedings are significant to my recommendations only insofar as they implicate Liberty's compliance with its settlement obligations in *McCracken* and its discovery obligations in *Blasingim*. In addition, contrary to Plaintiffs' position, I place little weight on the mere fact that Liberty was communicating with Blasingim and Campbell while they were still employed with Monarch. *Cf.* Lib. Subm. (Sanctions) at 27, n. 12. There is no indication in the record that either of them was subject to any non-competition or non-solicitation agreement with Monarch. Whether the substance of those communications otherwise supports Plaintiffs' claims is an issue for the trier of fact.

as counsel for all three defendants [ECF No. 38].

### 2.      Discovery Process

Just before Liberty was added to the litigation, both Blasingim and Campbell responded through Dentons to substantially similar discovery requests from Plaintiffs. Those requests sought, among other things, written communications between each defendant and any representative or employee of Liberty after January 1, 2018; documents (including, specifically, text messages) reflecting the circumstances of their hire by Liberty; and all documents and data that either defendant "accessed, copied, emailed to yourself, or removed from" Monarch prior to specified dates. Subject to certain objections and limitations, both Blasingim and Campbell committed to producing responsive documents. *See* Discovery Responses (Pl. Subm. Exs. 14, 15). Although Dentons apparently imaged and preserved both Blasingim and Campbell's cell phones early in the litigation, Dentons did not produce that information to Plaintiffs, and for reasons that remain unclear did not transfer that information to Gallagher Sharp when the matter was transitioned. Lib. Subm. (Sanctions) at 20; *see also* Ina Aff. ¶ 8 (Lib. Subm. (Sanctions) Ex. 21).

After Liberty was added, and the amended complaint was answered, discovery proceeded apace—but, "diplomatically put," "discovery did not go smoothly." *Brown v. Tellermte Holdings Ltd.*, No. 2:11-CV-1122, 2015 WL 4742686, at *1 (S.D. Ohio Aug. 11, 2015). Liberty asserts that Plaintiffs were "relentless and aggressive in pursuing discovery." Liberty Subm. (Sanctions) at 76; *see also* Ina Aff. ¶ 4 (Lib. Subm. (Sanctions) Ex. 21). Certainly, the discovery sought in this case was extensive, although not outside the bounds of the Federal Rules and not entirely surprising given the scope of the allegations, number of defendants, the parties' history, and the general morass that is modern electronic discovery. Discovery also was, by all accounts and as reflected in the record, extraordinarily contentious.

10

A complete discovery chronology is not necessary for my recommendations here, but I find the following discovery events to be significant in varying degrees (in addition to the initial responses of Blasingim and Campbell discussed directly above):

- On August 22, 2019, responding to deficiencies alleged by Plaintiffs, Gallagher Sharp confirmed on behalf of Blasingim and Campbell that all of their "personal and Liberty Steel-issued email addresses and devices have been preserved." Gallagher Sharp also averred that neither defendant had any documents or data in his possession relating to Plaintiffs or its "products, customers, suppliers, wholesalers, business contacts, plans, strategies, employees, pricing, or support services." Aug. 22, 2019 Letter (Pl. Subm. Ex. 17).

- On September 12, 2019, through Gallagher Sharp, Liberty responded to Plaintiffs' first discovery requests. Among other things, Liberty indicated that it did not have any documents responsive to Plaintiffs' request for "documents and data that are in your possession or under your control and that relate to American Consolidated Industries Inc. or any of its subsidiaries," including Monarch, or "Monarch's operations, products, customers, suppliers, wholesalers, business contacts, plans, strategies, employees, pricing, or support services." Response to RFP No. 8 (Pl. Subm. Ex. 11).

- In November 2019, the parties agreed to an ESI protocol that required searches of various data and devices, including specifically the individual defendants' and Grasso's cell phones. The custodians and search terms for the ESI search were identified in an appendix to the protocol. First ESI Protocol (Pl. Subm. Ex. 16).

- The parties retained a third-party e-discovery vendor, Epiq, to assist in the collection, search, and production of ESI. While both parties used Epiq, the retentions were treated

separately and each side had a separate Epiq team. Pl. Subm. at 33, n. 13.

- In November 2020, Plaintiffs took Blasingim and Campbell's depositions, and learned that their individual cell phones had been imaged but not produced. This necessitated a new ESI Protocol and search. Parties' Nov. 30 and Dec. 1, 2020 Letters to the Court (Pl. Subm. Exs. 18, 19). Former counsel for Liberty has indicated that "the failure to include Mr. Campbell's and Mr. Blasingim's cell phones or other personal devices as data sources searched was an oversight." Ina Aff. ¶ 8 (Lib. Subm. (Sanctions) Ex. 21).

- In December 2020, the parties entered into a "Supplemental Protocol Regarding the Search of Electronic Stored Information of Campbell and Blasingim." The protocol included a negotiated "Modified Search Term List." Second ESI Protocol (Pl. Subm. Ex. 20). Liberty's counsel forwarded the protocol to Epiq but "overlooked" the modified search term list, causing Epiq to re-apply the search terms from the 2019 protocol—a fact that only came to light during the Special Master process. Ina Aff. ¶ 10 (Lib. Subm. (Sanctions) Ex. 21).[5]

- On December 3, 2020, Plaintiffs took Grasso's deposition. Grasso testified that his cell phone had been imaged, but Liberty's counsel represented then and repeatedly thereafter that no such data was available. Pl. Subm. at 41-43. During the course of the Special Master process, as discussed below, Liberty's counsel in *McCracken* discovered that Grasso's phone actually had been imaged by Dentons in separate litigation involving Liberty. Liberty's counsel in *Blasingim* has since indicated that "to the extent Mr. Grasso's phone

---

[5] Although Blasingim was, at this point, represented by separate counsel at Nicola Gudbranson, the affidavit of former counsel from Gallagher Sharp suggests that the intended supplemental search of Blasingim and Campbell's cell phones was coordinated through Gallagher Sharp. Ina Aff. (Lib. Subm. (Sanctions) Ex. 21); *see also* Defendant Chad Blasingim's Response and Objections to the Status Report of Special Master and Request for Clarification or Amendment of Appointment Order [ECF No. 137] ("Blasingim Response and Objections") at 4, n. 4.

was a source of data for collection for discovery, I overlooked it" and "I was never aware during my representation in the *Blasingim* case that Mr. Grasso's phone had been imaged in connection with other litigation or by any other attorney." Ina Aff. ¶¶ 11-12 (Lib. Subm. (Sanctions) Ex. 21).

- On December 28, 2020, after repeated efforts to meet and confer, Monarch filed a motion to compel production of certain "pricing workups" that Liberty had objected to producing as irrelevant. Motion to Compel [ECF No. 64]. After the motion was granted, Liberty's counsel continued to resist production. Following clarification from Magistrate Judge Parker, in April 2021, Liberty produced 659 copies of the workup at issue. April 20, 2021 Letter (Pl. Subm. Ex. 27).

- In early 2021, both Blasingim and Campbell produced documents purportedly identified through application of the December 2020 ESI Protocol. *See* Pl. Subm. at 34.

- On May 5, 2021, as discussed above, Mericle testified in deposition that he had recently learned that documents relating to McCracken remained on Liberty's systems. Over the course of several weeks, Plaintiffs repeatedly requested production of those documents. Liberty's counsel consistently responded that the *McCracken* Settlement Agreement required that any disputed be raised with Judge Lioi. *See, e.g.*, June 15, 2021 Letter (attached as Ex. CC). These exchanges led to Plaintiffs' Motion for Contempt [ECF No. 109].

- During the joint hearing on Plaintiffs' Motion for Contempt and to Consolidate, responding to Judge Lioi's questions about the relevance of "McCracken" documents to the *Blasingim* case, Liberty's counsel asserted that "they're apples and oranges. We don't see how McCracken comes into this case." July 29, 2021 Hearing Tr. [ECF No. 135] at 51. Judge

Lioi expressed that the answer was "unbelievable," and further questioned the position that a "document is not relevant because it's apples and oranges . . . it could be proprietary information, it could be confidential information, it could be confidential information, it could be trade secret, but because it wasn't—didn't come into the possession of the—your client in the way the plaintiff thought it did, then it's not relevant, it's just apples and oranges?" *Id.* at 51-52.

- The fact discovery cutoff date in *Blasingim* was May 10, 2021. *See* Apr. 14, 2021 Minute Order. That date has not been extended.

### E.    Attorney Turnover

The attorney turnover in these cases also deserves mention. As noted, the defendants in *Blasingim* originally were represented by Dentons, before Gallagher Sharp substituted in for all three defendants to answer the amended complaint in June 2019. On September 30, 2019, Ms. Juergens withdrew, and Richard Rezie of Gallagher Sharp made his appearance for all defendants. On May 1, 2020, Nicola Gudbranson & Cooper, LLC substituted in as counsel for Blasingim only, with Gallagher Sharp continuing to represent Liberty and Campbell. On February 1, 2021, Ms. Ina withdrew, and Nicholas Anhold substituted in for Liberty and Campbell. On July 19, 2021, Mr. Strang withdrew, and Timothy Brick substituted in for Liberty and Campbell. In addition, none of the attorneys involved in *Blasingim* were involved in *McCracken*, with Manchester, Newman & Bennett having represented Liberty in that case.

The frequent turnover of counsel for Liberty no doubt contributed to the discovery issues that have been addressed through these Special Master proceedings. It also became a fallback explanation for Liberty's inability to manage certain of its discovery obligations in *Blasingim*, both

during the course of discovery and during these proceedings. *See, e.g.*, Pl. Subm. at 41-44 (as to issues with Grasso's cell phone).

## II.    SPECIAL MASTER APPOINTMENT AND PROCEEDINGS

On July 19, 2021, Plaintiffs filed their Motion to Hold Liberty Steel Products, Inc. in Contempt of the Court's December 12, 2017 Order and Motion to Transfer [ECF No. 109]. Following a hearing and briefing, the Court entered the Appointment Order on October 6, 2021. Pursuant to the Order, I was directed and authorized to address the pretrial matters raised by Plaintiffs' Motion for Contempt in the *McCracken* matter, including by establishing discovery schedules, reviewing and attempting to resolve informally any discovery conflicts, and supervising discovery, including the scope of discovery necessary to resolve the motion. Following resolution of such matters, I was directed to prepare this report and provide my recommendation on three distinct issues:

(1)    Disposition of the Motion for Contempt;

(2)    Whether discovery sanctions should be awarded against Liberty in the *Blasingim* matter and, if so, which sanctions and why; and

(3)    Whether reallocation of the Special Master's compensation is appropriate.

Appointment Order [ECF No. 122] at 5.

On October 18, 2021, I conducted an initial conference with counsel from Zashin & Rich in attendance for Plaintiffs; counsel from Manchester Newman & Bennett in attendance for Liberty in the *McCracken* matter; and counsel from Gallagher Sharp in attendance for Liberty and Campbell in the *Blasingim* matter. Following remarks by counsel, including Liberty's commitment that it was "an open book," I determined that the parties should jointly select and engage a third-party vendor to perform a forensic search of Liberty's systems using agreed-upon search terms

and parameters. This search was aimed at addressing the "the threshold issue" of "whether and what materials remain on Liberty's systems that (even arguably) are subject to the Confidential Settlement Agreement and Release entered into by the parties in *McCracken*." The cost of the forensic search was to be borne by the parties jointly, with the potential for reallocation of some or all costs depending on the outcome of the search.

Following several weeks of negotiation, the parties agreed to engage KLDiscovery Ontrack, LLC ("KLD") to perform the forensic search and host information for review and production. KLD represented that it did not have any conflicts and accepted the engagement. A "kick off" call was held on November 16, 2021, and the parties set about negotiating an ESI Protocol to govern KLD's work.

On December 7, 2021, Liberty's counsel in *McCracken* notified counsel and me that "new information" had been obtained about KLD and Grasso's cell phone:

> It has come to our attention that the phone of the former President of Liberty, James Grasso, was imaged in November 2019 through the course of separate, unrelated litigation. It is my understanding that none of Liberty's current counsel on this message knew that his phone had been previously imaged and is potentially available if needed. Because this imaging was done through different counsel and in a different litigation, some time and effort would likely be required to obtain the image.
>
> Further, in the course of investigating this, we learned that, despite KL Discovery doing a conflict check, KL Discovery actually has done work for Liberty by and through other counsel in the separate litigation and has done work through prior counsel in the *Blasingim* litigation. To be clear, the work performed by KL Discovery as part of the *Blasingim* litigation occurred prior to any attorney at Gallaher Sharp taking over representation in that matter.  The entire extent of KL Discovery's involvement is not known to me or any of Liberty's current counsel in the *McCracken* or *Blasingim* cases. Because we had previously represented to you that to our knowledge KL Discovery had no prior relationship with Liberty, we feel compelled to address this issue for prompt consideration and resolution, if any is needed

Dec. 7, 2022 Email (Pl. Subm. Ex. 29). This new information—in particular, the revelation that Grasso's phone data had been located after months of contentious back-and-forth about the same

16

subject—delayed negotiation of the ESI Protocol and necessitated additional work by all involved parties.

Ultimately, the parties agreed to proceed with KLD. On December 17, 2021, the parties' Third Stipulated ESI Protocol was agreed and submitted. ECF No. 128-1. Document collection, processing, review, and production consumed a large amount of time over the following several weeks. On January 27, 2022, the parties agreed to a targeted schedule for completion of discovery and Plaintiffs' preliminary identification of documents supporting their requests for contempt and discovery sanctions and additional discovery.

Consistent with that schedule, on March 4, 2022, Plaintiffs provided a preliminary report outlining their findings from KLD's forensic search of Liberty's systems and the specific documents that Plaintiffs had identified to support their request for contempt and discovery sanctions. In that report, Plaintiffs asserted that "newly produced records demonstrate" that Blasingim, along with Liberty and Campbell, violated his discovery obligations. Plaintiffs subsequently confirmed that they intended to seek discovery sanctions against Blasingim for those alleged violations.

Because Blasingim is separately represented and his counsel had not actively participated to that point in the Special Master process, I requested clarification from the Court as to whether the Appointment Order authorized me to consider and address discovery sanctions as to all of the defendants in the *Blasingim* matter, or only as to Liberty. ECF No. 132. The Court invited all parties to brief the issue. ECF No. 133. On March 25, 2022, Blasingim submitted his Response and Objections. Among other things, Blasingim noted for the first time that, having reviewed the search term reports from Epiq's supposed application of the modified search terms from the parties' Second ESI Protocol, "it appears that when Epic ran the searches it used the same word

17

searches that the parties previously provided to Epic to run on different devices many months earlier, and did not search for additional terms desired by Monarch (*e.g.* Campbell). Blasingim does not know why Epic only used the earlier search terms. Blasingim did not notice this, and Monarch either did not notice this or noticed this and said nothing about it." Blasingim Response and Objections [ECF No 137] at 4, n. 4.

On April 5, 2022, the Court entered an Order on my request for clarification. While the Court declined to modify the Appointment Order to "bring Mr. Blasingim within the scope of the Special Master's charge," the Court noted that the Appointment Order grants "authority to consider whether discovery sanctions in *Blasingim* are appropriate" and that "disposition of the motion for contempt in *McCracken* might have collateral effects in *Blasingim*." Order [ECF No. 145] at 2. The Court further explained that:

> discovery or sanctions potentially implicating Mr. Blasingim [do not] lie entirely outside the work of the Special Master. For example, if the Special Master recommends re-opening discovery in *Blasingim* or further proceedings to determine whether Mr. Blasingim engaged in conduct that subjects him to sanctions, the Court will consider any such recommendation in the Special Master's Report and Recommendation and determine how to proceed at that point.

Order at 3. Consistent with the Order, Blasingim's counsel have not participated in the Special Master process.

On April 8, 2022, Plaintiffs served their Submission to the Special Master on Motion for Contempt and Request for Discovery Sanctions. Following resolution of various challenges to Liberty's confidentiality and attorneys' eyes only designations, on April 29, 2022, Liberty served its two-part submission. The parties' briefing alone, not including the voluminous exhibits, totals 196 pages—which is to say that the issues have been thoroughly considered and presented.

On May 16, 2022, I learned through Plaintiffs' counsel that Blasingim had produced tens of thousands of new documents on May 9 and 11. In the correspondence accompanying the productions, Blasingim's counsel explained:

> As was discovered during the Special Master proceeding, when Epic previously performed the search of the image of Blasingim's cell phone, it used the original search terms that the parties previously provided to Epic to run on different devices earlier in the case and did not search for the additional search terms identified in Plaintiffs' Modified Search Term List 12.15.2020 (attached).

> We asked Epic to go back and to run a search of the image of Blasingim's cell phone for all of the search terms in the attached Plaintiffs' Modified Search Term List 12.15.2020.  Attached are the Search Terms Report for that revised search and a link to Liberty Document Production Volume 010 – Blasingim Supp Cell where you can access the documents that Blasingim is producing based upon the revised search.

May 9, 2022 Email from C. Yingling (attached as Ex. DD); *see also* May 16, 2022 Letter from A. Patel (attached as Ex. EE).

## III.    RECOMMENDATIONS

### A.    Contempt

Plaintiffs request the Court find Liberty in contempt in the *McCracken* case based on "multiple violations" of various interim orders entered while the parties were negotiating their settlement, the Dismissal Entry, and the Settlement Agreement. Pl. Subm. at 7. The parties both cite to this Court's decision in *Metron Nutraceuticals, LLC v. Cook, et al*. as setting forth the applicable standard for civil contempt. Case No. 1:20CV01803, 2021 WL 2946157 (N.D. Ohio July 14, 2021) (Calabrese, J.). As explained by the Court:

> A litigant may be held in contempt if his adversary shows by clear and convincing evidence that he [violated] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order. In the Sixth Circuit, to determine whether a party should be held in civil contempt, the court must consider whether the party took all reasonable steps within [his] power to comply with the court's order, not whether the party acted in good faith. Therefore, good faith is not a defense, but impossibility is. The party to

19

be held in contempt has the burden of proving impossibility. Further, willfulness or intent to disobey are not required to hold a party in civil contempt.

*Id.* at *1 (citations omitted).

The parties agree that the *McCracken* Settlement Agreement required Liberty to (1) return and destroy all Monarch Protected Property and Information, broadly defined to include Monarch's trade secret information regardless of the source and any Monarch information that McCracken secured through his employment with Monarch; and (2) not use, copy, retain, or disclose any Monarch Protected Property and Information. The parties also agree, or at least do not dispute, that the Dismissal Entry expressly incorporated the prohibition on using, copying, retaining, or disclosing Monarch Protected Property and Information, but did not expressly incorporate other provisions of the Settlement Agreement.

Based on the framing of the Dismissal Entry, Liberty asserts that any finding of contempt can be premised only on Liberty's use, copying, retention, or disclosure of Monarch Protected Property and Information, and not on any "alleged failures to meet the procedure outlined in the Settlement Agreement, as motions for contempt pertain exclusively to violations of court orders." Lib. Subm. (Contempt) at 46. But Liberty's position is inconsistent with *Kokkonen v. Guardian Life Ins. Co. of Am.*, where the Supreme Court held that where "the parties' obligation to comply with the terms of the settlement agreement [is] made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in that order," then "a breach of the agreement would be a violation of the order." 511 U.S. 375, 375 (1994).[6]

---

[6] Liberty also argues that the Dismissal Entry was, like the Order at issue in *Metron*, not intended "to create a path to contempt or some sanction, rather the Order intended to bring the case to a conclusion." Lib. Subm. (Contempt) at 49. But Liberty also acknowledges that it (and presumably Monarch) "bought its peace with the settlement" and "believed the litigation and the issues in it had been resolved." Lib. Subm.

Following this precedent, because the Court expressly retained jurisdiction over the Settlement Agreement in the Dismissal Entry, Liberty may be found in contempt if it failed to take all reasonable steps within its power to comply with the "definite and specific" requirements of the Settlement Agreement. By this measure, the record here supports a finding of contempt. As evidenced by what has transpired in *Blasingim* and by its own admissions, Liberty did not take all reasonable steps within its power to comply with its obligations under the Settlement Agreement to destroy and not retain Monarch Protected Property and Information—namely, for purported cost reasons, Liberty chose to rely on in-house resources rather than a third-party forensic service to carry out the remediation, and did not consider all potential sources of information within Liberty's systems. Particularly under the circumstances when Liberty also was actively recruiting and receiving information from other Monarch employees, Liberty's approach appears at the very least cavalier with respect to the letter and spirit of the Settlement Agreement.[7] *See also* Pl. Subm. at 13-19, 28 (as to insufficiency of search and destruction process).

Plaintiffs argue that Liberty separately violated Court Orders by using and disclosing Monarch's Protected Property and Information, including information that it obtained from and about Campbell and Blasingim. Plaintiffs point, for example, to an October 2017 text message in which Campbell provided his personal email address to Grasso, presumably to facilitate

---

(Sanctions) at 34-35. For this reason, and given the Court's retention of jurisdiction over the Settlement Agreement, the Dismissal Entry is distinguishable from the Order at issue in *Metron*.

[7] Plaintiffs argue that Liberty was required by the terms of the Settlement Agreement to engage a third-party forensic expert to conduct the document remediation. To be clear, I do not find that to be the case. What I find is that engaging a third-party forensic expert would have been a "reasonable step" within Liberty's power to comply with the terms of the Settlement Agreement, particularly since Grasso averred (mistakenly) that such a step had been taken, a third-party vendor was engaged for parallel remediation, and under the circumstances discussed above. This view is corroborated by the Special Master process, in which a third-party forensic service (KLD) was easily able to identify information on Liberty's servers that even Liberty concedes should have been remediated under the Settlement Agreement.

discussions around the "Southern Strategy." Pl. Subm. at 20 (MCCRACKEN016970). As another example, Plaintiffs cite a list of "top prospects" in the South that Campbell prepared and sent to Grasso. Pl. Subm. at 20 (CAMPBELL07407). These documents present a closer call, as they would require a determination that the information reflected in them actually constitutes Monarch's "trade secret information" to bring them within the definition of "Monarch Protected Property and Information" in the Settlement Agreement. This remains a hotly disputed issue among the parties, and I believe resolution of that dispute is best left for the trier of fact in this case. *Cf.* Lib. Subm. (Sanctions) at 6-9. As such, I do not base my recommendation for contempt on this category of information, but I do recommend that Liberty be required to segregate any information that remains in question pending a determination of its trade secret status. If any of the information is determined to be or contain "Monarch's trade secret property and protected information as defined by federal and Ohio law," then it should be securely and forensically remediated from Liberty's systems at that time, at Liberty's sole cost.

**B.      Discovery Sanctions**

Plaintiffs seek sanctions for an array of alleged discovery violations: (1) Liberty's failure to reasonably inquire as to the location, storage, and use of responsive records and data, including records and data collected by and remaining in the possession of prior counsel; (2) Liberty's failure to apply two agreed ESI protocols, resulting in the withholding of relevant information; (3) Liberty's failure to identify and produce copies of Plaintiffs' pricing work-up, even after Liberty was ordered to do so by the Court; (4) Liberty's failure to locate the image of Grasso's cell phone, and to preserve and produce data from the phone, until the images were fortuitously discovered in these Special Master proceedings; and (5) Liberty's use of "improper and unnecessary objections

and privilege claims," including Liberty's reliance on an overly restrictive view of "relevance." *See generally* Pl. Subm. at 34-46.

I agree that discovery sanctions are appropriate to address the discovery conduct Plaintiffs discuss in detail at the cited pages of their submission, and largely adopt Plaintiffs' points and authorities set forth in that section, excepting the discussion of the work up spreadsheet issue that was resolved by the Court prior to the Special Master proceedings (*cf.* Lib. Subm. (Sanctions) at 49) and Plaintiffs' claims that Liberty inappropriately asserted privilege over ARCIS's work.[8] Specifically, I agree that sanctions are appropriate based on the identified conduct and failures that occurred during discovery in *Blasingim* and were uncovered or brought into relief through consideration of the motion for contempt in *McCracken*.[9] In summary:

<u>Liberty failed to take reasonable steps to identify and locate responsive and relevant data.</u> As Plaintiffs note, Liberty has at times been unable to "articulate what it collected and when," including in response to direct questions in the Special Master proceedings about why certain information identified first by ARCIS and then by KLD had not previously been identified and produced in *Blasingim*, despite its responsiveness and relevance.[10] As Plaintiffs further note, at

---

[8] I do not adopt Plaintiffs' discussion following page 46, specifically as related to Plaintiffs' allegations of fraud. These again are issues for the trier of fact.

[9] Liberty asserts in its Submission on Sanctions that "this is a limited proceeding mainly addressed to the 'disposition of the motion for contempt in *McCracken*' and then" the appropriateness of sanctions in *Blasingim*. Lib. Subm. (Sanctions) at 31. Liberty objects to broadening the Special Master referral to consideration of allegations beyond Plaintiffs' initial allegation that Liberty "compounded its breaches of Judge Lioi's Stipulated Dismissal Order by its refusal to complete the search and produce all McCracken records responsive to Plaintiffs' discovery requests" in *Blasingim. Id.* While I agree that parties are not "entitled to perfect discovery," and acknowledge the relevancy and proportionality limitations on discovery under the Federal Rules, I do not take such a limited view of my charge here. To do so would ignore other requirements of the Federal Rules, including the requirements regarding supplementation, and effectively give Liberty a "pass" for acknowledged and inexcusable errors in the discovery process simply because they did not come to light before the fact discovery cutoff.

[10] Judge Lioi asked a similar question of Liberty's counsel during the July 2021 hearing: "I'm wondering why in your search for materials that will comply with the discovery requests, you did not find these

least in some instances, Liberty's counsel acted "as if it had no access" to prior counsel, despite their common client and matter. It is likely that "many, if not all of, the discovery failures" identified through what became a tedious supplemental process could have been "cured" with better coordination among counsel and their common client, including location of the Grasso cell phone image and the responsive records contained on it. *See* Pl. Subm. at 37-38 (*citing*, *e.g.*, *Waskul v. Washtenaw Cty. Cmty. Mental Health*, No. 16-10936, 2021 U.S. Dist. LEXIS 209859 (E.D. Mich. Oct. 31, 2021)); *see also* Lib. Subm. (Sanctions) at 19 (acknowledging failure to locate Grasso's cell phone image "obtained by other counsel"). The fact that this was not done until required through the Special Master process was, frankly, perplexing and troubling—and emblematic of the attorney turnover issues discussed above.

Liberty failed to apply agreed ESI protocols. Liberty admits that "the forensic images of the Campbell and Blasingim cell phones and personal devices were not initially searched under the November 2019 ESI Protocol" and, when arrangements were then made to search the images, "as was discovered in this contempt proceeding, the 2019 search terms were used instead of the new search terms." Lib. Subm. (Sanctions) at 19; *see also* Ina Aff. ¶ 10 (Lib. Subm. (Sanctions) Ex. 21).[11] Liberty's failure to fully apply the first protocol overlaps with the issues discussed immediately above, as the failure resulted from counsel's "oversight" in not appreciating that prior counsel had imaged the individual defendants' cell phones. As to Liberty's failure to apply the second protocol, I requested that the parties answer the question "who is responsible for ensuring

---

documents and why they were not discovered until May of 2021." July 29, 2021 Hearing Tr. [ECF No. 135] at 23-24.

[11] As noted above, while these errors largely impacted discovery of Blasingim and Campbell's devices, and it is not clear which if any of those were "Liberty" devices. Nonetheless, Liberty and Campbell were represented by common counsel, who also appears to have coordinated efforts at least to some degree for Blasingim.

that a vendor properly applies an agreed ESI protocol and search terms?" This question was prompted by Liberty's attempt to shift all or some of the blame to Plaintiffs for what we now understand to have been a botched application of the parties' agreed search terms. *See, e.g.*, Lib. Subm. at 37.

Citing The Sedona Principles, Liberty responds that "a responding party may satisfy its good faith obligations to preserve and produce relevant electronically stored information by using technology and processes, such as sampling, searching, or the use of selection criteria." Lib. Subm. (Sanctions) at 66. This is undoubtedly true, but does not fully address the question of oversight. Plaintiffs also cite to The Sedona Principles for the proposition that "a responding party is best situated to preserve, search, and produce its own ESI. This principle is grounded in reason, common sense, procedural rules, and common law, and is premised on each party fulfilling its discovery obligations without direction from the court or opposing counsel." Pl. Subm. at 36; *see also Brown*, 2015 WL 4742686 at *7 ("trial counsel must exercise some degree of oversight to ensure that their client's employees are acting competently, diligently and ethically in order to fulfill their responsibility to the Court"); *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 883 (N.D. Ill. 2021) ("counsel cannot just lay the blame on an ESI vendor.").

Particularly as here, where the parties dealt independently with the ESI vendor, it is incumbent on the producing party to ensure that direction to the vendor is complete and accurate, and to make sure that any production resulting from the vendor's work is also complete and accurate—the producing party cannot rely on direction from opposing counsel to fulfill its discovery obligations, nor shift responsibility to the vendor. Liberty cannot avoid that its failure to effectively coordinate with its ESI vendor to ensure that correct search terms were applied created significant confusion, required "do-over" discovery, and kept a significant volume of responsive

information from Plaintiffs.[12] While I do not find Liberty's errors here to be malicious or willful, there is no question that Liberty did not fulfill its discovery obligations with respect to the ESI protocols.

Liberty's view of "relevance" was overly restrictive. As noted previously, Liberty has attempted to avoid discovery of various categories of documents in this case as irrelevant, including the so-called "McCracken" documents. Liberty's position in this regard is inconsistent with the fact that, as it repeatedly notes, it actually produced some of these documents in *Blasingim*, precipitating Plaintiffs' motion for contempt. *See, e.g.*, Lib. Subm. (Sanctions) at 45. Further, as Judge Lioi's questions during the July 2021 hearing illustrate, Liberty's view of relevance in responding to discovery in *Blasingim* also appears to have been overly restrictive, hindering and delaying the production of documents that—though Liberty may contest their interpretation—are indisputably relevant.

Liberty is correct that there is no violation of a discovery order here such as to make sanctions appropriate under Rule 37(b). Lib. Subm. (Sanctions) at 51, 58. But sanctions still may be appropriate under other Rules and authority, including Rule 37(c) based on the Defendants' (acting through common counsel) failure to supplement their discovery responses, and Rule 26(g)(3) based on the Defendants' failure to perform reasonable inquiry into the existence and location of responsive records before asserting in discovery that such record did not exist or were not available. Fed. R. Civ. P. 26 & 37; *see also Brown*, 2015 WL 4742686 at *13 (affirming Magistrate Judge's decision to award sanctions where counsel for Defendant responded to the Plaintiffs' discovery requests without performing a reasonable inquiry into whether Defendant

---

[12] This is underscored by Blasingim's recent production of thousands of documents following application of the correct protocol to his records.

could produce certain records). In addition, sanctions under 28 U.S.C. § 1927 are "appropriate where there has been some conduct on the part of the subject attorney that trial judges could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Id.* at *14 (*citing Dubuc v. Green Oak Twp.*, 482 Fed. Appx. 128, 134 (6th Cir. 2012)).

### C.     Allocation of Costs and Recommended Sanctions

Plaintiffs ask me to recommend extraordinary sanctions, up to entry of a default judgment against Liberty and an award to Plaintiffs of "all fees and expenses associated with McCracken and Blasingim to date." Pl. Subm. at 62-63. I do not believe the circumstances warrant such punitive sanctions, and decline to recommend them to the Court. As Liberty points out in its Submission on Sanctions, dismissal "is the sanction of last resort." Lib. Subm. (Sanctions) at 72; *see also Brown*, 2015 WL 4742686 at *9 (in choosing sanctions, a court "must consider whether punishment short of entering a default as to liability, or some issue connected with liability, would be sufficient to address the magnitude of the misconduct involved.").

On the other hand, it is clear to me that these Special Master proceedings were necessary to cure certain failings by Liberty in executing its obligations under the *McCracken* Settlement Agreement, and even more so to uncover and cure other failings by Liberty to satisfy its discovery obligations in *Blasingim*. Even accounting for the added challenges of litigating in a global pandemic (and attorney turnover), Liberty's numerous "oversights" in carrying out fundamental discovery obligations under the applicable Rules and the parties' agreed protocols is inexcusable. Liberty also created unfair and unnecessary roadblocks to Plaintiffs' discovery through its overly restrictive interpretation of relevance, including as between the *McCracken* and *Blasingim* cases. But for Plaintiffs' motion for contempt, a significant volume of relevant information would have

gone undiscovered. *See* Pl. Subm. at App. A (documents in red not previously produced). For these reasons, I recommend that the Court impose sanctions on Liberty, requiring it alone to bear the cost of "curing" its contempt and discovery failures.

## V.    CONCLUSION

For the foregoing reasons, I respectfully recommended that:

A.    Plaintiffs' Motion for Contempt [ECF No. 109] should be granted in part and denied in part. Documents and information that the parties agree was improperly retained in violation of the *McCracken* Settlement Agreement should be securely and forensically deleted from Liberty's systems, accounts, and devices at Liberty's expense. Additional documents and information that have been identified through the Special Master process as potentially violative of the Settlement Agreement should be segregated pending determination by the trier of fact as to whether such materials contain or constitute "Monarch's trade secret property and protected information as defined by federal and Ohio law."

B.    Discovery sanctions against Liberty in the *Blasingim* matter are appropriate.

C.    As a sanction, Liberty should be required to exclusively bear all fees and expenses associated with these Special Master proceedings, including the Special Master compensation and third-party vendor fees.

D.    The Court should re-open discovery in *Blasingim* for the very limited purpose of allowing Plaintiffs sufficient opportunity to follow up on the information that has come to light through these Special Master proceedings and Blasingim's recent production, and to seek related sanctions against Blasingim as may be warranted.

In accordance with Rule 53(f) of the Federal Rules of Civil Procedure and section II.D. of the Appointment Order, any party may file objections to, or a motion to adopt or modify, this Report and Recommendation within twenty-one calendar days. Failure to timely file objections may result in permanent waiver.

Dated: May 20, 2022

Respectfully submitted,

s/ Stephanie E. Niehaus
Stephanie E. Niehaus (0075511)
200 Park Avenue
Suite 1700
New York, NY 10017
Office: 212-457-1668
Cell: 440-897-1287
stephanie.niehaus@nelson.legal

## CERTIFICATE OF SERVICE

I certify that, on May 20, 2022, I electronically filed the foregoing document on the Court's CM/ECF system. Notice of this filing will be sent automatically to all counsel of record. Parties may access the filing through the Court's system.

s/ Stephanie E. Niehaus